# In the United States Court of Federal Claims

No. 13-001
(Filed under seal February 19, 2013)
(Reissued March 4, 2013)

* * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| **SUPREME FOODSERVICE GMBH,** | * | Post-award bid protest; override of the |
|  | * | CICA automatic stay, 31 U.S.C. § 3553(d); |
| Plaintiff, | * | Defense Logistics Agency Troop Support; |
|  | * | judgment on the administrative record, |
| v. | * | RCFC 52.1; Subsistence Prime Vendor |
|  | * | contract; stay applies when result of |
| **THE UNITED STATES,** | * | corrective action is protested; *Reilly's* |
|  | * | *Wholesale* factors; no immediate threat to |
| Defendant, | * | health, safety or welfare supports urgent and |
|  | * | compelling circumstances determination; |
| and | * | best interests determination running counter |
|  | * | to evidence; reasonable alternative; |
| **ANHAM FZCO,** | * | irrational cost-benefit analysis; declaratory |
|  | * | relief. |
| Defendant-Intervenor. | * |  |
|  | * |  |

* * * * * * * * * * * * * * * * * * * * * * * * *

*David Z. Bodenheimer*, Crowell & Moring, LLP, Washington, D.C., for plaintiff. *Thomas P. Humphrey, Jonathan M. Baker, James G. Peyster*, and *Grant J. Book*, all of Washington, D.C., of counsel.

*Robert C. Bigler*, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Deborah A. Bynum*, Assistant Director, all of Washington, D.C., for defendant.

*Eric J. Marcotte*, Vedder Price P.C., Washington, D.C., for defendant-intervenor.  *Kevin P. Connelly, Kelly E. Buroker, Jacob W. Scott, Kyle E. Gilbertson*, all of Washington, D.C., of counsel.

## **OPINION AND ORDER**[1]

WOLSKI, Judge.

---

[1]  This opinion was initially filed under seal, to allow the parties to propose redactions --- which have been adopted, with the deleted text replaced in the following manner: "[XXX]."  The opinion is released for publication with some minor, non-substantive corrections.

The plaintiff, Supreme Foodservice GmbH ("Supreme"), is an unsuccessful offeror for a U.S. Department of Defense contract to provide food to U.S. military and other personnel in Afghanistan. Supreme is currently providing this service under a bridge contract that lasts through mid-December 2013. Its earlier protest of the award to defendant-intervenor Anham FZCO ("Anham" or "intervenor"), brought before the Government Accountability Office ("GAO"), resulted in corrective action which culminated in a second decision to award the contract to Anham. After Supreme filed with the GAO a timely protest of this second decision, the procuring agency decided to override the stay of contract performance which would otherwise occur under the Competition in Contracting Act ("CICA"), 31 U.S.C. § 3553(d)(3). Because of this override, the six-month long implementation phase of the new contract has been proceeding --- a period during which Supreme, as the incumbent, continues to perform the service of delivering food. Supreme's bid protest filed in our court challenges the override decision as arbitrary, capricious, and contrary to law. For the reasons that follow, the Court agrees with Supreme, and declares the override to be arbitrary, invalid and of no effect.

## I. BACKGROUND

### A. The Procurement

The Subsistence Prime Vendor ("SPV") Afghanistan program involves the government's selection of the prime contractor responsible for providing subsistence food products to the United States military and other federally-funded customers in Afghanistan. Administrative Record ("AR"), Tab 3 at 244. Supreme Foodservice GmbH is the incumbent contractor and has been performing these services since 2005. AR, Tab 9 at 717. From June 5, 2005 until December 12, 2010, plaintiff performed under its first SPV contract; and from December 13, 2010 through December 12, 2012, plaintiff performed these services under non-competitive, sole-source bridge contracts. *Id.*

On March 2, 2011, the Department of Defense Inspector General ("DoDIG") issued a report that found a number of control weaknesses in the administration of the initial SPV contract with Supreme. AR, Tab 2 at 66. The contracting agency, Defense Logistics Agency Troop Support ("DLA" or "agency"), had failed to put in place a plan and written procedures for monitoring such things as shipping weights, quantities of materials, and modes of transportation used. *Id.* at 84-89; *see also* AR, Tab 9 at 719. The DoDIG report also described a number of alleged overpayments made by DLA. AR, Tab 2 at 84-89.

On April 26, 2011, DLA Troop Support issued solicitation SPM300-11-R-0063 for a fixed-price indefinite-delivery, indefinite-quantity contract (with economic price adjustments) for a full-line food distributor to supply and deliver all semi-perishable, perishable, and frozen food items to military personnel and federal government employees throughout Afghanistan. AR, Tab 3 at 244, 389; AR, Tab 9 at 715-16. The duration of the contract was to be for a term of sixty-six months, with three separate pricing tiers covering different time periods. AR, Tab 3 at 342. According to the solicitation, the first tier would be a thirty-month period (including a six-month ramp-up period followed by twenty-four months of performance), and the second and third tiers would each consist of an eighteen-month performance period. *Id.* at 342, 378.

The solicitation contemplated a best-value procurement with the technical factors, when combined, being "significantly more important than price components."  AR, Tab 3 at 379-80. The four Technical Factors, listed in descending order of importance, were as follows: Factor I, Experience/Past Performance; Factor II, Distribution System/Quality Assurance; Factor III, Private Convoy Security Capability; Factor IV, Operational Support; and Factor V, Socioeconomic Considerations.  *Id*. at 380-82.  Factor I included four subfactors.  Subfactors A and B rated the offeror's Experience and Contract Performance/Customer Satisfaction, and were of equal importance.  *Id*. at 383-84.  Subfactors C and D, rating Socioeconomic Past Performance and AbilityOne Past Performance, were equal in importance to each other and less important than Subfactors A and B.  *Id*.  Factor II included several subfactors of equal importance rating the offeror's warehouse location, capacity and resource availability, airlift capability, quality control and warehouse procedures, product protection and food defense, and surge and sustainment capability.  *Id*. at 381, 385-86.  Factor III evaluated the offeror's private convoy security capability, giving more favorable ratings to plans demonstrating a higher rate of successful execution.  *Id*. at 386.  Factor IV was used to evaluate the offeror's plans to support Afghanistan national employment initiatives and plans to utilize the Civil Reserve Air Fleet/Voluntary Intermodal Sealift Agreement.  *Id*.  Finally, a fifth and least important factor evaluated socioeconomic goals on a comparative basis among all offerors.  *Id*. at 382, 386.

The technical evaluation process utilized the adjectival ratings of Outstanding, Good, Acceptable, Marginal, and Unacceptable.  AR, Tab 3 at 382-83.  The solicitation defined "Outstanding" to mean that a "proposal meets requirements and indicates an exceptional approach and understanding of the requirements."  *Id*. at 383.  To merit this rating, "[s]trengths far outweigh any weaknesses," and the "[r]isk of unsuccessful performance is very low."  *Id*.  A "Good" proposal was defined as one that "meets requirements and indicates a thorough approach and understanding of the requirements," that "contains strengths which outweigh any weaknesses," and that has a low risk of unsuccessful performance.  *Id*.  An "Acceptable" proposal is one that meets requirements, "indicates an adequate approach and understanding of the requirements," and poses a "[r]isk of unsuccessful performance [that] is no worse than moderate."  *Id*.  "Marginal" was used for a proposal that did "not clearly meet requirements and has not demonstrated an adequate approach and understanding of the requirements." *Id.*  Such a proposal would have "one or more weaknesses which are not offset by strengths," and present a "[r]isk of unsuccessful performance [that] is high."  *Id*.  "Unacceptable" proposals did not meet requirements and would not be given an award.  *Id*.

The price evaluation process included all tiered pricing periods, and was divided into two main components.  The first component was the Weighted Aggregate Distribution Price, which was "more important than" the second component, Weighted Aggregate Product Price.  AR, Tab 3 at 386-87.  The DLA would add these two components together in order to calculate a Total Evaluated Price.  *Id*. at 387.  The solicitation stated that because the procurement would use the trade-off process specified in 48 C.F.R. § 15.101-1, the government "may accept other than the lowest priced proposal as the overall best value."  *Id*. at 382.  The solicitation further stated that the government would make "a technical merit assessment based on information contained in the proposal and other information, which has or may be derived from sources other than the proposal."  *Id*.

On June 11, 2012, the contracting officer issued a Justification and Approval ("J&A") supporting issuance of another non-competitive, sole-source bridge contract --- with Supreme to continue performing as the SPV contractor through December 12, 2013.  Compl., Ex. 2 ("Pl.'s Ex. 2").  The J&A stated that the bridge contract was necessary to continue an uninterrupted supply of the necessary subsistence items until the new procurement could be fully implemented. *Id*. at 1.  According to the contracting officer, "the required foodservice supplies are available only from the current contractor in the timeframe required, and award to any other source would result in unacceptable delays."  *Id*.

After completing the source selection process for the four final proposals submitted in response to the solicitation, on June 22, 2012, DLA awarded the contract SPM300-12-D-3571 to Anham FZCO for the 66-month period, with an estimated award value of $8,065,696,363.40. AR, Tab 9 at 716.  The contract included a six-month implementation phase, during which the incumbent contractor, Supreme, would "remain the principal source of food and non-food supplies."  AR at 615.  The contract further contemplated that Anham would make its first order for supplies within 90 days, but would not make its first delivery until 180 days after it received the award.  *Id*. at 616.

## B.  GAO Protests and the Second Award

On July 5, 2012, Supreme filed with the GAO a protest of the award to Anham.  AR, Tab 9 at 715.  This triggered an automatic stay of Anham's performance under 31 U.S.C. §3553(d)(3), and DLA accordingly suspended performance pending resolution of the protest.  *Id.* at 716.  On October 11, 2012, GAO partially sustained Supreme's protest.[2]  *Supreme Foodservice GmbH*, B-405400.3 *et al*., Oct. 11, 2012, 2012 CPD ¶ 292; AR, Tab 7 at 634-48. The GAO found that the record did not adequately reflect DLA's evaluation of past performance; that the agency's evaluation of past performance was inconsistent and unreasonable; and that such inconsistency resulted in unequal treatment of offerors.  AR, Tab 7 at 639-46.  The GAO recommended that DLA reevaluate Supreme's and Anham's proposals under Factor I for Experience/Past Performance "in a manner that is reasonable and consistent with the solicitation's evaluation criteria," and that the agency should conduct a new price/technical tradeoff analysis after completing and documenting the reevaluation.  *Id*. at 647.  The GAO further recommended that if Anham's proposal was not found to offer the best value after the reevaluation, DLA should terminate Anham's contract and make a new award to the offeror whose proposal provided the best value to the government.  *Id*. at 647-48.

The government followed the GAO's recommendation, agreeing to take the recommended corrective action by performing a limited reevaluation of Factor I and a new price analysis.  AR, Tab 10 at 726.  On October 20, 2012, DLA informed Supreme of the intended corrective action, stating that DLA did not intend to reopen negotiations, but that after the

---

[2] Supreme's GAO protest included a number of other allegations which GAO found did not provide an additional basis to sustain the protest.  AR, Tab 7 at 647.  These allegations included Supreme's contentions that DLA improperly failed to amend the solicitation, conducted unequal discussions, and conducted an incomplete analysis of Anham's capability.  *Id*.

reevaluation, DLA "will make a new award decision." *Id.* During the reevaluation, Supreme received an "Outstanding" overall technical rating, while Anham received a "Good" overall technical rating. AR, Tab 14 at 733-34. The new price analysis determined that Supreme's total evaluated price was $4,723,740,821.02, while Anham's total evaluated price was $3,274,790,930.32. *Id.* at 733. The DLA also determined that Supreme had a "Very Low" overall risk level while Anham had a "Low" risk level. *Id.*

On December 7, 2012, DLA informed Supreme that the agency had completed the corrective action and had determined that Anham's proposal still provided the best value to the government. AR, Tab 12 at 728. On December 12, 2012, DLA provided Supreme a debriefing concerning the reevaluation and the second award of the contract to Anham. AR, Tab 14 at 732-37.

In response, Supreme filed another GAO protest on December 17, 2012, challenging the reevaluation and the new award decision. *See* AR, Tab 8 at 649-714. The new protest alleged that DLA had again misevaluated Anham's experience and past performance, unreasonably evaluated Supreme's proposal under Factor I, and treated offerors unequally --- particularly since Supreme had received higher ratings under Factor I and a higher overall technical rating. AR, Tab 8 at 676-709. Supreme's protest also alleged that Anham's proposal included misrepresentations concerning its [XXX XXX XXX]. *Id.* at 669-76. On December 18, 2012, DLA requested that GAO decide the protest under the express option procedures in 4 C.F.R. § 21.10, which would require GAO to issue its decision within 65 days. Compl. ¶25. GAO denied the request but stated that it would "make every effort to resolve [Supreme's] protest as quickly as possible." *Id.*

## C. DLA's Determination and Findings Regarding the CICA Stay

Supreme's GAO protest of December 17, 2012, should have again triggered the CICA automatic stay. *See* 31 U.S.C. § 3553(d). On December 21, 2012, however, DLA notified the GAO that the agency had issued a written Determination and Findings ("D&F") which concluded that the CICA stay did not apply --- adding that, to the extent that the stay would be required under 31 U.S.C. § 3553(d)(3)(A), the agency's contracting officer had determined that overriding the stay was "in the best interests of the United States," and that "urgent and compelling circumstances . . . will not permit waiting for the GAO decision on the subject protest." AR, Tab 22 at 747. On December 26, 2012, DLA sent its D&F to Supreme. AR, Tab 24 at 749-61.

In the D&F, the agency's head of contracting activity related that "DLA Troop Support did not issue a stop work order when it received Supreme's most recent protest." AR, Tab 9 at 717. He took the view that the decision to award the contract to Anham on December 7, 2012, was not a new award but instead a mere reaffirmation of the previous award, and thus needed to be protested within ten days of the June 22, 2012 award (or within five days of a June 29, 2012 debriefing) for the CICA stay to apply. *Id.* The D&F also determined that the override was in the government's best interests and, as support for this claim, cited: 1) the past and ongoing pricing disputes between Supreme and DLA; 2) the problems cited in the DoDIG report concerning the SPV contract administration; 3) DLA's lack of personnel and resources to

adequately monitor various aspects of contract performance; and 4) the agency's vulnerability to potential fraud due to terms in Supreme's existing SPV contract.  AR, Tab 9 at 717-20, ¶¶ 6-8.

In addition, the D&F stated that "urgent and compelling circumstances significantly affecting the interests of the United States" also warranted an override of the stay.  AR, Tab 9 at 720, ¶ 9.  In support of this assertion, the D&F stated that any further delay of the implementation phase of Anham's contract "would negatively impact the Government's mission" in Afghanistan.  *Id*. at 721, ¶ 9.  The D&F further stated that successful implementation of Anham's contract would require coordination with multiple government bodies, and both contractor and government assets --- and thus delay in the performance of Anham's contract "impacts the Government's ability to plan for and coordinate" these resources needed for the transition.  *Id*.  Additionally, uncertainty regarding when Anham would begin performance was said to adversely impact the government's ability to plan for future subsistence requirements.  *Id*.

### 1.  The DoDIG Report

The DoDIG report, cited in the D&F, found a number of problems with DLA's administration of the initial contract with Supreme, running from December 2005 through December 2010.  AR, Tab 2 at 68-99, 73.  Listed as "Finding A" in the report, the IG determined that better contract administration of costs and performance was needed.  *Id*. at 77.  Specifically, the report found that DLA "did not provide sufficient oversight of contract costs and performance," "did not adhere to certain provisions of the Federal Acquisition Regulation and the DoD supplement," and did not "develop a Quality Assurance Surveillance Plan" or written procedures to monitor contractor costs.  AR, Tab 2 at 68, 76-78.  The report found that DLA had apparently approved overpayments to Supreme based on minimum rather than actual shipping weights, erroneous records of transportation modes or costs, and incorrect triwall[3] costs.  AR, Tab 2 at 68, 77, 81-89.  It also identified as weaknesses DLA's failures to determine the accurate quantity of triwalls, to verify fill rates and performance-based distribution fees, and to adequately monitor government-furnished material.  *Id*.  The DoDIG recommended that DLA take a number of actions, such as requesting assistance from the Defense Contract Audit Agency ("DCAA") in determining fair and reasonable prices; analyzing and re-considering the current prices DLA was paying Supreme; developing a plan and written procedures for ensuring quality and for monitoring costs and performance; and performing a review of Supreme's contract in light of the various problems in order to take "any administrative actions warranted by the review."  AR, Tab 2 at 91-92.  In response to this report, the Acting Commander of DLA agreed that the agency would review the administration of Supreme's contract and take the necessary steps to correct the problems.  AR, Tab 2 at 92.  The agency also assured DoD that all recommendations would be fully implemented no later than December 31, 2011.  *Id*.

The DoDIG report also determined as "Finding B" that DLA needed to correct the appropriation funds used for transportation, triwall, and storage costs.  AR, Tab 2 at 93.  The DoDIG found that between 2006 and 2009 DLA personnel had billed the Army a substantial amount for costs incurred under Supreme's contract to the incorrect fiscal year appropriation

---

[3] Triwalls are "three-layered corrugated boxes used for packaging and shipping chilled or frozen food products."  AR, Tab 2 at 68 n.*.

fund.  AR, Tab 2 at 93.  Corrective action taken in 2008 apparently had not been completely effective.  *Id.*  The report recommended that DLA refund $56.5 million to the Army, establish cost controls on future SPV contracts, and conduct reviews of all SPV contracts to ensure that costs were charged to the correct fiscal year appropriation.  *Id.* at 98.

### 2.  *The Pricing Dispute*

The D&F also discussed an ongoing dispute between DLA and Supreme concerning the appropriate prices for certain deliveries.  AR, Tab 9 at 717-19.  The contract was originally priced based on ground deliveries to four locations, but through change orders had been expanded to more than [XXX] locations, most inaccessible by simple ground transportation.  *See* AR, Tab 2 at 73-74; AR, Tab 4 at 427.  In 2006, DLA had provisionally established Premium Outbound Transportation ("POT") rates, concerning costs associated with these additional delivery points and transportation modes, based on prices proposed by Supreme.  AR, Tab 4 at 428.  The agency requested two DCAA audits concerning the POT rates.  *Id.*  The DCAA conducted those audits on December 19, 2008, and August 29, 2011, but found that many of the documents requested from Supreme were incomplete or unavailable.  *Id.*  According to DLA's contracting officer, because of the lack of success in negotiating these rates with Supreme, the contracting officer used the audit reports, which identified possible overpayments to Supreme, *see* AR, Tab 2 at 105, and the agency's "own expertise" to "unilaterally definitize" the POT rates at an amount determined to be fair and reasonable.  AR, Tab 4 at 428-29; *see also* AR, Tab 5 at 434-36.  Based on those new rates, the contracting officer determined on December 9, 2011, that Supreme owed the agency $756,908,587 for past overpayments.  AR, Tab 4 at 427-33.  Supreme has appealed this determination to the Armed Services Board of Contract Appeals ("ASBCA").  AR, Tab 9 at 718.  Supreme's counsel has apparently stated that Supreme also intends to file a claim against DLA for unpaid POT fees.  *Id.*

## D.  Procedural History

On January 2, 2013, Supreme filed a bid protest with our court, requesting declaratory and injunctive relief to enforce the CICA stay.  The complaint alleged one count --- that DLA's decision to override the automatic stay was arbitrary, capricious, and contrary to law; that DLA's improper decision has and will harm Supreme; and that DLA should be enjoined from proceeding with the override until the GAO issues its decision on Supreme's protest.  Compl. at 12 (Claims for Relief ¶¶ 1-6).  In particular, the complaint alleged that the reasons given for the override in the agency's D&F were arbitrary and capricious, and that such reasons do not provide a legitimate basis for disregarding the automatic stay.  *Id.*  The complaint requested a declaratory judgment that DLA's decision to override the CICA stay was invalid, as well as a temporary restraining order and preliminary and permanent injunctions enjoining the government and Anham from performing on the SPV Afghanistan contract.  Compl. at 13 (Requests for Relief ¶¶ 1-5).

The Court held an initial status conference on January 3, 2013, during which the Court granted Anham FZCO's motion to intervene and decided to proceed on an expedited briefing schedule as agreed to by the parties.  *See* Order (Jan. 3, 2013).  On January 4, 2013, the government filed an administrative record consisting of 761 pages.  The administrative record in

this case consists of the following documents and records: a federal criminal indictment of The Public Warehousing Company, K.S.C. (AR, Tab 1 at 1-63); the March 2, 2011 DoDIG report (AR, Tab 2 at 64-119); Solicitation SPM300-11-R-0063 (AR, Tab 3 at 120-426); the DLA Troop Support Contracting Officer's decision, debt determination, and demand for payment from Supreme regarding alleged overpayments (AR, Tab 4 at 427-433); Modification 108 to Contract SPM300-05-D-3130 with Supreme (AR, Tab 5 at 434-436); SPV Contract SPM300-12-D-3571 with Anham (AR, Tab 6 at 437-633); the GAO decision of October 11, 2012 (AR, Tab 7 at 634-648); Supreme's GAO protest of December 17, 2012 (AR, Tab 8 at 649-714); DLA Troop Support's D&F regarding Anham's continued performance during the GAO protest (AR, Tab 9 at 715-725); a notification to Supreme of corrective action (AR, Tab 10 at 726); notifications to Supreme regarding the reevaluation result (AR, Tabs 11-12, at 727-728); a debriefing letter request from Supreme, and response to that request (AR, Tabs 13-14, at 730-737); an email and attachments regarding Supreme's POT claims (AR, Tabs 15-21, at 738-746); and miscellaneous communications from DLA Troop Support to the GAO and Supreme's counsel (AR, Tabs 22-24, at 747-61).[4]

On January 15, 2013, the plaintiff, the defendant, and the intervenor all moved for judgment on the administrative record. In its motion, the plaintiff argues that DLA violated CICA's statutory mandate that federal agencies automatically stay contract performance from receipt of the requisite notice until the GAO protest is resolved. Pl.'s Mot. J. Admin. R. ("Pl.'s Br.") at 8 (citing 31 U.S.C. § 3553(c)(1), (d)(3)(A)). Supreme contends that DLA's reasoning that the CICA stay does not apply in this case is flawed, and would, if upheld, violate CICA's legislative purpose and "eviscerate" the stay. Pl.'s Br. at 9-14. The plaintiff also contends that DLA's "best interests" argument in support of the override fails the governing legal standards; is based on facts which are unsupported or irrelevant; and is inconsistent with other documents in the administrative record. *Id.* at 14-22. Finally, Supreme argues that, contrary to the agency's D&F, there are no "urgent and compelling circumstances" justifying the override --- particularly because DLA has not shown that any adverse consequences will result from the stay; gave Supreme's proposal a higher overall technical rating than Anham's; and has a reasonable alternative to performance, in the form of Supreme's present contract. *Id.* at 22-29. The plaintiff additionally argues that DLA failed to account for the potential costs to the agency if Supreme's protest is sustained by the GAO, and failed to show how the harm caused by the stay would outweigh the damage to the integrity of the procurement system inflicted by the override. *Id.* at 29-32.

---

[4] The plaintiff has moved to supplement the record with the J&A issued for its current bridge contract (ECF No. 31). At the hearing on January 25, 2013, the government and intervenor indicated they had no objection to this motion, *see* Tr. (Jan. 25, 2013) ("Tr.") at 4-5, and the motion to supplement is accordingly **GRANTED**. Similarly, the intervenor's motion to supplement the record with an email from the GAO and a declaration from an officer of an Anham affiliate (ECF No. 27) is not opposed, Tr. at 4-5, and is accordingly **GRANTED**. The government also submitted a copy of Supreme's current bridge contract, *see* Ex. 1 to Def.'s Opp'n ("Def.'s Ex. 1"), which was treated as a supplement to the administrative record. *See* Tr. at 4-5.

The government argues that the typical injunctive relief factors apply to the Court's decision whether to grant plaintiff the relief it requests, Def.'s Mot. J. Admin. R. ("Def.'s Br.") at 23, and that the plaintiff cannot show that it has or will suffer irreparable harm from DLA's override of the stay. Def.'s Br. at 23-25. The government further contends that Supreme cannot succeed on the merits, because the latter cannot show that DLA's override decision was arbitrary, capricious, or contrary to law. *Id*. at 25-26, 34. In support of this contention, the government argues that there was a rational basis for the override decision because: 1) DLA and Supreme have engaged in an ongoing dispute and even litigation over various pricing issues which have resulted in uncertainty concerning price, *id*. at 26-27; 2) plaintiff's bridge contract is "vulnerable to fraud," while Anham's contract reduces the possibility of fraud, *id*. at 26, 28-29; 3) DLA appropriately considered cost and financial risk factors and determined that because Anham must pay for its own costs during the implementation phase, DLA will not be subjected to undue or duplicative costs, *id*. at 29-31; 4) plaintiff's bridge contract is the only alternative to meet DLA's needs in Afghanistan, and that contract is subject to pricing uncertainty and liability issues, *id*. at 31-32; and 5) the override enhances competition because it would replace Supreme's non-competitive bridge contract with a competitively-awarded contract, *id*. at 32. Finally, DLA contends that "urgent and compelling circumstances" justify the override because the SPV Afghanistan contract is "essential to the mission of the United States," *id.* at 33 (citing AR, Tab 9 at 721), and because it is critical that the implementation phase proceed as quickly as possible --- since it requires coordination between various government offices which can be difficult and uncertain in a chaotic war zone such as Afghanistan. *Id*. at 32-34.

Intervenor Anham's motion for judgment makes many of the same arguments as the government's motion, but further emphasizes the contention that the plaintiff has not demonstrated any harm from the override because Supreme will continue to perform its bridge contract during the entire pendency of the GAO protest. Anham FZCO's Mot. J. Admin. R. ("Intervenor's Br.") at 24, 25, 30. Anham further contends that the override does not pose any potential irreparable harm to Supreme because Supreme has no right to retain a competitive advantage and because Supreme's concerns about the disclosure of sensitive information are speculative. Intervenor's Br. at 27-30. According to Anham, there is no need to use information about Supreme's suppliers, routes, or schedules because Anham already has a fully-developed distribution network and does not need either information or employees from Supreme. *Id*. at 29-30. On the other hand, Anham argues that it will suffer harm if the plaintiff's request is granted, because the intervenor will have twice begun to perform the contract at its own cost, and has had to bear the costs of maintaining and securing its idle facilities during Supreme's protests. *Id*. at 31-32. Moreover, although both the government and intervenor have argued that the factors listed in *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705 (2006), for determining the propriety of CICA stay overrides is not dispositive, *see* Def.'s Br. at 19-20; Intervenor's Br. at 13-14, the intervenor contended that DLA has sufficiently addressed and satisfied the *Reilly's Wholesale* factors. Intervenor's Br. at 22-25.[5]

---

[5] The defendant did not expressly address these factors, but maintains that its initial brief "demonstrated" that the factors were considered by DLA, as "the D&F demonstrates." Def.'s Opp'n at 13.

On January 22, 2013, each of the parties filed an opposition or reply paper.  *See* Def.'s Opp'n to Pl.'s Mot. for J. on the Admin. R. ("Def.'s Opp'n"); Anham FZCO's Reply to Pl.'s Mot. for J. on the Admin. R. ("Intervenor's Reply"); Pl.'s Opp'n to Defs.' Mots. for J. on the Admin. R. ("Pl.'s Opp'n").  The Court held a hearing on the motions for judgment on January 25, 2013.  After carefully considering the arguments of counsel, the documents in the record, and the relevant caselaw, the Court has determined that the override decision was arbitrary and invalid.[6]

## II.  DISCUSSION

### A.  Legal Standards

#### *1.  Bid Protest Jurisdiction*

Bid protests are heard by this Court under the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, §§ 12(a)-(b), 110 Stat. 3870, 3874 (1996).  The relevant provision states that our court "shall have jurisdiction to render judgment on an action by an interested party objecting to . . . any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. §1491(b)(1) (2006).  Under this provision, "[a] non-frivolous allegation of a statutory or regulatory violation in connection with a procurement or proposed procurement is sufficient to establish jurisdiction."  *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 n.1 (Fed. Cir. 2008).  Challenges to alleged violations of the CICA automatic stay provision are within this jurisdiction.  *RAMCOR Servs. Grp., Inc. v. United States*, 185 F.3d 1286, 1290 (Fed. Cir. 1999).

The Federal Circuit has construed the ADRA term "interested party" to have the same definition as under CICA, encompassing "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract."  *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001); *see* 31 U.S.C. § 3551(2).  As an actual offeror challenging the award of a contract before the GAO, there is no question that Supreme is an interested party for purposes of our court's jurisdiction.

#### *2.  Judgment on the Administrative Record in a Bid Protest*

The ADRA amendments to the Tucker Act require our court to follow Administrative Procedure Act ("APA") standards of review in bid protests.  28 U.S.C. § 1491(b)(4).  Those standards, incorporated by reference, provide that agency action may be held unlawful and set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (2006).[7]

---

[6] The parties were previously informed of the Court's ruling during a status conference held via telephone with their counsel.  *See* Tr. (Feb. 12, 2013) at 4-6.

[7] Based on an apparent misreading of the legislative history, *see Gulf Grp., Inc. v. United States*, 61 Fed. Cl. 338, 350 n.25 (2004), the Supreme Court had determined, before the 1996 enactment

A motion for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") differs from motions for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment on the administrative record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005); *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006). Rather, a motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review. *See Fort Carson*, 71 Fed. Cl. at 585; *Greene v. United States*, 65 Fed. Cl. 375, 382 (2005); *Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 388 (2005). Factual findings are based on the evidence in the record, "as if [the Court] were conducting a trial on the record." *Bannum*, 404 F.3d at 1357; *see also Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 337 (2009); *Gulf Grp.*, 61 Fed. Cl. at 350.

Under the "arbitrary and capricious" standard, the Court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" by the agency. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) ("*Overton Park*"). Although "searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* The court will instead look to see if an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). The Court must determine whether "the procurement official's decision lacked a rational basis," *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) ("*Domenico Garufi*") (adopting APA standards developed by the D.C. Circuit); *see also Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984). A second ground for setting aside a procurement decision is when the protester can show that "the procurement procedure involved a violation of regulation or procedure." *Domenico Garufi*, 238 F.3d at 1332. This showing must be of a "clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Under the first rational basis ground, the applicable test is "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). This entails determining whether the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency,'" or made a decision that was "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). An additional consideration is whether "the agency has

---

of the ADRA, that the *de novo* review standard of 5 U.S.C. §706(2)(F) does not usually apply in review of informal agency decisions --- decisions, that is, such as are made in the course of procurements. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971).

relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Because of the deference courts give to discretionary procurement decisions, "the 'disappointed bidder bears a heavy burden of showing that the [procurement] decision had no rational basis.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)). "The presence (by the government) or absence (by the protester) of any rational basis for the agency decision must be demonstrated by a preponderance of the evidence." *Gulf Grp.*, 61 Fed. Cl. at 351; s*ee Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 117 (2003); *Info. Tech. & Appl'ns Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001) (citing *GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 779 (1997)), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003). If arbitrary action is found as a matter of law, the Court will then decide the factual question of whether the action was prejudicial to the bid protester. *See Bannum*, 404 F.3d at 1351-54.

### *3. Injunctive Relief*

In a bid protest, our court has the power to issue a permanent injunction pursuant to 28 U.S.C. §1491(b)(2). In determining whether to grant a motion for a permanent injunction, the court applies a four-factored standard, under which a plaintiff must show: 1) that it has actually succeeded on the merits; 2) that it will suffer irreparable harm if the procurement is not enjoined; 3) that the harm suffered by it, if the procurement action is not enjoined, will outweigh the harm to the government and third parties; and 4) that granting injunctive relief serves the public interest. *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009); *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); *Mobile Med. Int'l Corp. v. United States*, 95 Fed. Cl. 706, 742-43 (2010). None of the four factors, standing alone, is dispositive; thus, "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993); *AshBritt, Inc. v. United States*, 87 Fed. Cl. 344, 378 (2009). Conversely, the lack of an "adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors," to deny the injunction. *Chrysler Motors Corp. v. Auto Body Panels, Inc. v. United States*, 908 F.2d 951, 953 (Fed. Cir. 1990). A lack of success on the merits, however, obviously precludes the possibility of an injunction. *See Tech Sys., Inc. v. United States*, 98 Fed. Cl. 228, 268 (2011); *Gulf Grp.*, 61 Fed. Cl. at 364.

## B.  Was the Override Determination Arbitrary and Capricious?

Under CICA, after Supreme timely filed its pending protest with the GAO on December 17, 2012, *see* AR, Tab 8 at 649, the contracting officer was required to "immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract." 31 U.S.C. § 3553(d)(3)(A)(ii) (2006). This cessation of performance, commonly referred to as CICA's "automatic stay," is the rule, by command of Congress, lasting through the determination of the protest, *see* 31 U.S.C. § 3553(d)(3)(B). The stay is legally mandated, until performance is authorized by the head of procurement activity in a written finding that either "performance of the contract is in the best interests of the United States" or "urgent and

compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." 31 U.S.C. § 3553(d)(3)(C)(i).

Instead of the stay kicking in upon notice of Supreme's protest, until overridden by a D&F, Anham's performance was never directed to cease. *See* AR, Tab 9 at 717 (explaining "DLA Troop Support did not issue a stop work order when it received Supreme's most recent protest"). The head of contracting activity was of the unusual opinion that if a reevaluation of offers occurring under corrective action results in the decision to reaffirm an earlier award, the CICA stay does not apply when this new decision is protested before the GAO (since it will necessarily be more than ten days after the initial award and more than five after the initial debriefing). *See id.* at 715, 717.[8] Thus, the D&F he issued on December 21, 2012, contained the primary determination that the CICA stay did not apply in the circumstances presented. *Id.* Neither the defendant nor the intervenor defended this aspect of the D&F, which appears to the Court to have clearly been erroneous --- performance of Anham's contract should have been ordered to cease upon notice of Supreme's timely GAO protest.

Rather than using the D&F to authorize the resumption of performance of the protested contract, the head of contracting authority used it to rationalize the unceased and continuing performance of that contract. But he also "did consider whether suspending performance under the subject contract was in the Government's best interest." *Id.* at 715. While the premise of this exercise had things backwards --- the issue to be determined was whether a stay should be overridden, not whether one should be imposed --- the result is the same. By determining whether performance of Anham's contract during the pendency of the GAO proceedings was in the government's best interests or justified by urgent and compelling circumstances, the head of contracting authority satisfied procedurally the written override requirements (for the period beginning the date the D&F was issued). The question before the Court is whether this D&F substantively met the arbitrary and capricious APA review standard that applies under 28 U.S.C. § 1491(b)(4). *See RAMCOR*, 185 F.3d at 1290.

The parties all acknowledge that the variation of this review standard that has been termed the "hard-look doctrine," *see CBY Design Builders v. United States*, 105 Fed. Cl. 303, 337 (2012), articulated by the Supreme Court in *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983), applies in this context. *See* Def.'s Br. at 19; Intervenor's Br. at 13; Pl.'s Opp'n at 9. Under this approach, an agency decision

> would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

---

[8] This interpretation of CICA was unusual, but apparently not unique. *See PMTech, Inc. v. United States*, 95 Fed. Cl. 330, 338 n.7 (2010).

*Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Ala. Aircraft*, 586 F.3d at 1375.

The parties part ways, however, when it comes to the manner in which several of our judges have applied this doctrine in challenges to override decisions. In *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705 (2006), one judge of our court surveyed the field of prior decisions and was able "to distill from the relevant cases a variety of factors that an agency must consider in making an override decision," which included:

> (i) whether significant adverse consequences will necessarily occur if the stay is not overridden . . . ; (ii) conversely, whether reasonable alternatives to the override exist that would adequately address the circumstances presented . . . ; (iii) how the potential cost of proceeding with the override, including the costs associated with the potential that the GAO might sustain the protest, compare to the benefits associated with the approach being considered for addressing the agency's needs . . . ; and (iv) the impact of the override on competition and the integrity of the procurement system, as reflected in [CICA] . . . .

*Reilly's Wholesale*, 73 Fed. Cl. at 711 (citations omitted). That opinion further explained:

> The decisional law also indicates that certain factors are irrelevant to this analysis, among them: (i) that the new contract would be better than the old one . . . ; or (ii) the override and continuation of the contract is otherwise simply preferable to the agency . . . .

*Id.* (citations omitted). Although compiled for a case involving an override under an "urgent and compelling circumstances" determination, these two lists of factors were derived from cases among which included "best interests" determinations, *see id.* n.10, and have been employed in cases reviewing overrides based on either justification. *See Nortel Gov't Solutions, Inc. v. United States*, 84 Fed. Cl. 243, 247-51 (2008) (using the factors to review an urgent and compelling circumstances determination); *Superior Helicopter LLC v. United States*, 78 Fed. Cl. 181, 189-94 (2007) (applying the factors to a best interests determination); *E-Management Consultants, Inc. v. United States*, 84 Fed. Cl. 1, 6-10 (2008) (same).

The government and Anham urge the Court to adopt the reasoning contained in the opinion in *PMTech, Inc. v. United States*, 95 Fed. Cl. 330 (2010), which held that the *Reilly's Wholesale* factors could be helpful, but need not always be employed in override determinations. *See PMTech*, 95 Fed. Cl. at 343-47; Def.'s Br. at 19-21; Intervenor's Br. at 13-14. The plaintiff, on the other hand, maintains that a head of procurement activity must consider the four factors that *Reilly's Wholesale* found to be relevant to override determinations, and cannot base the decision on the two factors deemed irrelevant. *See* Pl.'s Br. at 22-32; Pl.'s Opp'n at 5-7, 17, 20-23.

Defendant goes so far as to argue, with no supporting citation, that "[t]his Court is not empowered to identify factors that a Federal agency must consider in making an override decision based upon the best interests of the United States." Def.'s Br. at 20-21. But this argument cannot be squared with the *Motor Vehicle Manufacturers Ass'n* decision which, as we

have seen, makes whether an agency "entirely failed to consider an important aspect of the problem" a ground for finding arbitrary agency action. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. It is not apparent why our court --- which has been entrusted by Congress with jurisdiction over protests challenging procurement law violations, *see* 28 U.S.C. § 1491(b)(1) --- should not, following frequent consideration of such matters, be allowed to recognize factors that would necessarily be important for any override decision. This is exactly what the first four *Reilly's Wholesale* factors represent. *See E-Management Consultants*, 84 Fed. Cl. at 4-5. Similarly, familiarity with the Congressional purpose behind the automatic stay would naturally lead to the identification of factors, such as the new contract being better than what it would replace or its performance being preferred to alternatives, that were implicitly "factors which Congress has not intended [an agency] to consider." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. The two factors found irrelevant in *Reilly's Wholesale* fall in that category. *E-Management Consultants*, 84 Fed. Cl. at 5.

After repeated elaboration, it should be beyond controversy that the point of the CICA automatic stay was to enhance the GAO as a forum for bid protests, so that the integrity of the competitive procurement process could be protected. *See, e.g.*, *PMTech*, 95 Fed. Cl. at 346-47; *CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100, 112 (2006); *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 657-58 (2003). Before the stay existed, a contract whose award was the subject of a protest could have been performed for several months while the matter was considered by the GAO. That office's ultimate determination that the award was improper --- and thus, may not have been the best option for an agency to follow --- would come with a recommendation, not a mandate, that the award be cancelled, which an agency might have been inclined to disregard because of the costs incurred and progress made under the awarded contract. "Thus, 'the automatic stay is intended to preserve the *status quo* during the pendency of the protest so that an agency would not cavalierly disregard GAO's recommendations to cancel the challenged award,' thereby 'preserv[ing] competition in contracting and ensur[ing] a fair and effective process at the GAO.'" *Reilly's Wholesale*, 73 Fed. Cl. at 710 (alterations in original) (quoting *Advanced Sys. Dev., Inc. v. United States*, 72 Fed. Cl. 25, 31(2006)).

In light of this purpose, even though the stay may be overridden when in the best interests of the government or when certain urgent and compelling circumstances so require, *see* 31 U.S.C. § 3553(d)(3)(C)(i), it is hard to see how an override decision could fail to consider "the impact of the override on competition and the integrity of the procurement system," *Reilly's Wholesale*, 73 Fed. Cl. at 711, and still be rational. And since the stay was the rule, and an override the exception, it would make little sense were the latter to be available whenever an agency felt its latest solicitation was an improvement over the previous contract. Competition is, after all, supposed to lead to lower prices and higher quality, *see Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 400 (2005), and agencies would be expected to learn from past procurements when updating solicitations. Thus, if an agency's belief that the awardee's proposal offered the best value --- in response to a solicitation that was an advancement over prior procurements --- were sufficient to override the stay, "as a practical matter, the automatic stay would be meaningless in virtually every single instance in which a GAO protest was filed." *University Research Co. v. United States*, 65 Fed. Cl. 500, 503 (2005); *see also PGBA*, 57 Fed. Cl. at 662-63.

From this, it follows that rather than focusing on the benefits of the new contract (particularly since that means performance by a contractor whose award might prove to have been arbitrarily made), agencies should consider the existence of "significant adverse consequences [that] will necessarily occur if the stay is not overridden." *Reilly's Wholesale*, 73 Fed. Cl. at 711. To determine the *necessity* of contract performance to avoid these consequences, it could hardly be rational for an agency to ignore the existence of "reasonable alternatives to the override" that would also do the job. *Id.* And in all events, if the costs of an override when a protest might be sustained would outweigh the benefits received through immediate performance of a contract, the override would neither be in the best interests of the United States nor justified by the urgency of the circumstances. If no effort is made to compare these costs and benefits, an agency cannot rationally find an override of the stay to be warranted.[9]

All told, it is hardly exceptional to require agencies to consider the first four *Reilly's Wholesale* factors, or to disregard consideration of the other two. In highlighting these particular factors, our court is not substituting its judgment for that of an agency concerning aspects that are important for a particular procurement, but is rather identifying factors that would logically be necessary or irrelevant to override decisions in general. The Court has no difficulty concluding that the *Reilly's Wholesale* factors (and non-factors) should be used in reviews of CICA stay overrides. Concerning the four factors which must be considered --- whether it is because the heads of procurement activity are on notice of our decisions, or due to the sheer logic of the factors, as explained above --- it is appropriate that our court should expect each of them to be discussed in override determinations. Indeed, following paragraphs discussing why the override was believed to be in the government's best interests or justified by the appropriate urgent and compelling circumstances, the D&F under review in this case contains three paragraphs expressly addressing the reasonable alternatives to, potential cost of, and impact on competition due to the override, AR, Tab 9 at 722-24 --- three of the *Reilly's Wholesale* factors. Therefore, the tasks for the Court are, first, to determine where the reasons given in support of the best interests and urgent and compelling circumstances determinations fall in the divide between significant disadvantages, on the one hand, and the new contract being better than the old one or preferable to alternatives, on the other; and then to decide whether the agency "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

### *1. The Urgent and Compelling Circumstances Determination*

Although the government acknowledges that "the main reason" it contends the override should be sustained is the best interests determination, *see* Tr. (Jan. 25, 2013) ("Tr.") at 78, and it devoted barely more than one page of argument in support of the urgent and compelling circumstances ground in its first brief and but two pages in its second, *see* Def.'s Br. at 32-34;

---

[9] This is not to suggest that the "threat of immediate harm to health, welfare or safety" that can support a finding of urgent and compelling circumstances, *see PMTech*, 95 Fed. Cl. at 346, must be quantified in dollar terms in order for an agency to determine that an override is worth the cost.

Def.'s Opp'n at 13-14, the Court will begin with the latter determination.[10]  Under this ground, the head of procurement activity must find that "urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest." 31 U.S.C. § 3553(d)(3)(C)(i)(II).  As it sounds, this is a higher standard to meet than finding performance to be "in the best interests of" the government, 31 U.S.C. § 3553(d)(3)(C)(i)(I), but there is a reason for the higher bar.  When the GAO sustains a protest for which the automatic stay was overridden on best interests grounds, its recommended action shall be "without regard to any cost or disruption from terminating, recompeting, or reawarding the contract." 31 U.S.C. § 3554(b)(2); *see also* 4 C.F.R. § 21.8(c).  But when an override was based on urgent and compelling circumstances, the GAO is free to take such cost or disruption into account in deciding what to recommend.

One thing that should be made clear at the outset is that a stay of performance of Anham's contract would not interfere with the feeding of our troops in Afghanistan.  The bridge contract being performed by Supreme runs through December 12, 2013, *see* Def.'s Ex. 1 at 2; AR, Tab 9 at 717, and the first six months of the new contract is a transition or "implementation" phase, during which food deliveries would still be performed by Supreme under the bridge contract.  *See* AR, Tab 6 at 615-16.  Thus, the practical effect of the stay (if revived) would be to delay the remaining transition work --- which could resume on or by the March 27, 2013 deadline for the GAO decision, *see* 31 U.S.C. § 3554(a)(1), unless, of course, the protest is sustained.  The bridge contract was authorized in order "to assure uninterrupted, continued foodservice support to the subject customers . . . until the follow-on contractor completes transition and proves capable of assuming full performance."  Pl.'s Ex. 2 at 4.  As DLA Troop Support's head of contracting activity acknowledged in the D&F, "the current non-competitive contract is in place satisfying instant requirements." AR, Tab 9 at 721.  Were the stay of performance to be instituted today, so that intervenor had accomplished about ten weeks of the implementation phase of the contract, a denial of Supreme's protest on March 27, 2013 would allow the rest of the transition work to be completed by mid-July --- well before the bridge contract would expire.

As one of our judges persuasively reasoned in *PMTech*, by analogy to the CICA provision allowing sole source procurements, the types of circumstances that qualify as "urgent and compelling" and that "significantly affect interests" of the government are those in which there is the "threat of immediate harm to health, welfare, or safety." *PMTech*, 95 Fed. Cl. at 345-46.  Those are the sorts of "significant adverse consequences" that must be identified by an agency as necessarily occurring in the absence of an override.  *See Reilly's Wholesale*, 73 Fed. Cl. at 711.  A careful review of the fewer than three pages of the D&F dedicated to the urgent and compelling circumstances determination does not reveal any such immediate threat of harm, and the consequences that are discussed are without any documented support. *See* AR, Tab 9 at 720-22.

The discussion of urgent and compelling circumstances begins by noting that "[t]he SPV Afghanistan contractor provides crucial warfighter support in a critical AOR [(Area of

---

[10]  Anham discussed this ground in less than three pages of its initial brief.  *See* Intervenor's Br. at 10, 20-22.

Responsibility)]." AR, Tab 9 at 720. The head of contracting activity describes the responsibilities of the contractor, including "feeding approximately 77,000 troops and 28,000 contractors at more than 200 locations every day . . . manag[ing] a supply pipeline . . . maintain[ing] warehouse space, qualified authorized personnel, and assets . . . maintain[ing] life-support facilities" and "provid[ing] force protection for its warehouses, trucks, and food products." *Id*. at 720-21. Summing things up, the D&F states that "the SPV contractor provides support that is essential to the mission of the United States." *Id.* at 721. The Court notes that the "crucial" and "essential" support to be provided under the new contract is not in itself an urgent and compelling reason to begin contract performance, as there is no dispute that these same services are currently being capably performed by the plaintiff under the bridge contract.[11] The head of contracting activity then finds: "While fully developing the capability to handle these requirements primarily occurs during the six-month implementation phase of Anham's contract, delay of the implementation phase any longer would negatively impact the Government's mission." *Id.*

The remainder of this section of the D&F and the following one purport to explain this negative impact. The key passage reads:

> Successful implementation of this cont[r]act requires not only coordination of contractor assets, but also Government assets as well, notably, coordination with VETCOM, CENTCOM/RAC, DLA Distribution, and TRANSCOM. Delay in the implementation and performance of Anham's contract impacts the Government's ability to plan for and coordinate these implementation procedures and *can negatively impact the mission in the AOR by diverting and disrupting critical resources*. For example, coordination of VETCOM site visits, CENTCOM review and approval of security plans, and arranging TRANSCOM air/ocean shipments diverts those Government resources from their standard operation. *Requiring those resources to be available and/or standby* pending resolution of the protest continues to be unacceptable. Urgent performance and implementation is *necessary to free up Government resources as soon as possible*. Similarly, uncertainty regarding when and how Anham will begin performance under the new contract adversely impacts the Government's ability to plan for and satisfy crucial future subsistence requirements. Although the current non-competitive contract is in place satisfying instant requirements, failure to have the follow-on contract in place prohibits the Government from *planning new supply routes, developing new sources of supply*, and coordinating resources in support of long term goals in the AOR.

AR, Tab 9 at 721 (emphases added). The following paragraph describes the implementation efforts conducted prior to the first protest and notes that "full planning" was expected to begin in January. This portion of the D&F concludes: "Continued performance is urgently necessary as protest litigation has already delayed planning and implementation for nearly six months from

---

[11] Indeed, Supreme received the technical rating of "Outstanding" and the risk level of "Very Low" for its proposal, bettering the awardee in both respects. *See* AR, Tab 14 at 733.

the original award.  As a result, Government operations, both domestically and abroad, have been negatively impacted by the delay."  *Id.* at 722.

As can be seen, no immediate threat to health, welfare, or safety has been described to support the existence of urgent and compelling circumstances.  The agency's complaint regarding the impact of a stay of performance is that personnel with other important responsibilities cannot sit around waiting for the GAO decision, and would be pulled from those other tasks if their work associated with the contract transition were rescheduled for the future.  There are several problems with these findings.  First, it is not explained *why* these officials (and associated resources) would have had "to be available and/or standby pending resolution of the protest," AR, Tab 9 at 721, rather than return to "their standard operation" and shift their implementation schedules by the maximum 100-day period for the decision to be issued.[12]  Second, and perhaps most importantly, if the diversion of these resources from their other responsibilities "can negatively impact the mission" in the future, *id.*, why would not such an impact also result if the resources are unnecessarily diverted in the present to attend to the implementation of a contract that may have been improperly awarded?  Perhaps because the agency was of the belief that Supreme's protest had little chance of success, *see id.* at 723-24, this prospect does not appear to have been contemplated.

In a similar vein, "uncertainty regarding when and how Anham will begin performance," *id.* at 721, assumes that Anham is the proper awardee, and planning that relates to that contractor's performance --- such as finding "new supply routes" and "new sources of supply," *id.* --- would be wasteful rather than beneficial if the award is found to have been arbitrarily made.  Indeed, the possibility that the resources currently diverted to the implementation of intervenor's contract would have been for naught is the only sort of immediate harm that is apparent in this portion of the D&F.  Many of the activities to be coordinated with the other offices were scheduled to take place several months into the transition period --- such as security plans 60 days into contract performance, carrier agreements within 75 days, and facilities inspections within 120 and 180 days.  *See* AR, Tab 6 at 615-16.  The D&F does not explain what, if any, obstacles would have prevented the resources involved from being reassigned to "standard operation" with that much lead time, or precluded shifting the schedules to take into account the expected length of the GAO proceedings.  Nor is there anything within the rest of the administrative record addressing these matters.

The agency does not explain why coordination and scheduling with other offices would be so much more difficult in the six months beginning March 27, 2013, than in those beginning December 7, 2012, such that immediate harm to health, welfare or safety would be threatened.  The government concedes that there is nothing in the administrative record showing that the particular months have any significance.  Tr. at 74.  Nor is there any explanation why the concerns about diversion of critical resources were not present in July, 2012, when the agency did not override the automatic stay associated with Supreme's prior protest of the award to Anham.  The agency complains that "Government operations, both domestically and abroad, have been negatively impacted by the delay" in "planning and implementation" due to that stay

---

[12]  The Court notes that the decision on Supreme's first protest issued ninety-eight days after the protest was filed.  *See* AR, Tab 9 at 715.

of performance. AR, Tab 9 at 722. But it undoubtedly takes more time to conduct a fair and rational competitive procurement than to follow other courses. Here, the initial delay in performance was due to the agency's failure to properly evaluate experience and past performance, which made the original award to Anham unreasonable. *See* AR, Tab 7 at 639-48. The only negative impact identified appears to be a delay in plans, but those plans should not have been based on an unreasonable award.

The government argues that one reason why circumstances might have changed since last summer is that the time remaining under the bridge contract may not be sufficient to accommodate the implementation phase of the new contract. *See* Def.'s Br. at 33; Def.'s Opp'n at 14. But this reason was not given by the agency in the D&F, and thus cannot be used to justify the decision. *See Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). Moreover, it is contradicted by the administrative record, which indicates that the bridge contract runs through December 12, 2013, *see* AR, Tab 9 at 717; Def.'s Ex. 1 at 2 --- ample time for a six month transition beginning no later than March 27, 2013.[13] Intervenor argues that the availability of resources currently scheduled for the implementation of its contract represents a "window of opportunity" which might be closed in the future. Intervenor's Br. at 21; *see also* Tr. at 111-12. But again, nothing in the record explains why this was a bigger problem following a protest filed in December than it was when the protest was filed five months earlier.

The Court acknowledges that, particularly in a war zone, conflicting claims on resources may make them unavailable at certain times. But this unavailability, and the resulting impact on the government, is simply not explained in the J&A nor supported in the administrative record. If the need to accomplish transitions quickly when contracts are to be performed in a war zone were enough to justify the override of the CICA stay, this would also seemingly justify ignoring any resulting GAO recommendation --- which the agency disclaims. *See* AR, Tab 9 at 724. The administrative record contains no evidence supporting an immediate threat of harm to health, safety or welfare, and the explanation regarding the diversion of resources is too implausible to attribute to differing judgment and expertise. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. On this record, it was arbitrary for the agency to find that urgent and compelling circumstances justified an override of the automatic stay.

### 2. The Best Interests Determination

The D&F contains three numbered sections, totaling less than three pages, describing why the override was believed to be in the best interests of the United States. *See* AR, Tab 9 at 717-20. The first of these concerns "pricing issues" between DLA Troop Support and Supreme under the previous contracts, including the current bridge contract. *Id*. at 717-19. Under the SPV Afghanistan contract awarded to Supreme in 2005, the contractor was to be paid distribution fees to make deliveries from its [XXX] warehouse to four locations (Kabul, Bagram,

---

[13] Although the justification for the current bridge contract, approved June 21, 2012, stated that the implementation period for a new contractor was expected to last ten months instead of six, *see* Pl.'s Ex. 2 at 2-4, the subsequent contract with Anham retains the six-month implementation schedule. *See* AR, Tab 6 at 616.

Kandahar and Solerno). *See* AR, Tab 2 at 73; AR, Tab 4 at 427.  Change orders expanded the delivery locations to Forward Operating Base sites, first adding [XXX] and ultimately as many as [XXX] additional locations.  *See* AR, Tab 2 at 74; AR, Tab 4 at 427.  The use of ground transportation was not feasible for many of these, necessitating the employment of planes and helicopters to make the deliveries, compensated under Premium Outbound Transportation rates. AR, Tab 2 at 74.

The contract modification formalizing this arrangement used tentative rates proposed by Supreme, expressed as dollars per pound, covering transportation by fixed-wing craft, helicopter, or ground, as well as tentative rates for the use of triwalls.  *Id.* at 75.  The government agreed to reimburse Supreme at seventy-five percent of each rate, until the rates were confirmed or adjusted following a DCAA review.  *Id.*  The agency and Supreme were unable to reach agreement on final rates.  AR, Tab 4 at 429.  Following two DCAA audits (in December 2008 and August 2011), the Contracting Officer issued a final decision on December 9, 2011, which unilaterally definitized the rates at levels that were [XXX] to [XXX] percent of the tentative rates.[14]  *Compare id.* (POT rates per pound of $[XXX] for helicopter, $[XXX] for fixed wing, and $[XXX] for ground) *with* AR, Tab 2 at 75 (tentative POT rates of $8.35, $2.65, and $0.48, respectively).  Based on use of these lower rates, on the determination that distribution fees should offset part of the POT payments, and on the conclusion that twenty-four of the delivery locations serviced by ground transportation did not warrant use of POT rates, the contracting officer decided that Supreme was overpaid $756,908,587 by the agency through September 30, 2011.  AR, Tab 4 at 429-32.[15]

The overpayment decision is currently on appeal before the ASBCA.  *See* AR, Tab 9 at 718.  The current bridge contract contains tentative POT rates that are [XXX]% higher than the unilateral definitized rates and "may be adjusted, as necessary and appropriate," following the ASBCA's decision or a subsequent agreement of the parties.  Def.'s Ex. 1 at 2-3; *see also id.* at 69 (listing tentative POT rates).  In the D&F, the head of contracting activity discusses the ASBCA matter and states that counsel for Supreme has indicated the contractor intends to file its own claim seeking perhaps more than $[XXX] in POT fees (through October 2011).  AR, Tab 9 at 718.  The agency calculates that the rates at which Supreme seeks payment are more than [XXX XXX XXX] the tentative rates in the bridge contract.  *Id.*  It notes the continuing disagreements over whether Supreme should be paid based on minimum billable rates and whether the agency should receive credit for distribution fees.  *Id.*  And the agency states that Supreme "has been claiming that it is owed around $30 million per month" in POT fees, while the former "has been paying Supreme in the neighborhood of $13 million per month for POT." *Id.*  In October and November of 2012, Supreme apparently claimed $17.8 million and $18.2 million more in fees than would be payable under the tentative rates.  *Id.*; *see also* AR, Tab 15 (agency email concerning POT payments, Sept.-Nov., 2012), Tabs 16-21 (Supreme invoices for Sept.-Nov., 2012).

---

[14]  The contract apparently contained the contract definitization clause located at 48 C.F.R. § 252.217-7027.  *See* AR, Tab 4 at 428.

[15]  The decision also rejected Supreme's contention that its payments should be based on minimum billable weights per shipment.  AR, Tab 4 at 428-29.

After discussing the difference in the parties' positions concerning the appropriate POT rates, the head of contracting activity concludes: "Given the considerable risk and uncertainty concerning POT rates under the current contract, it is in the best interest of the Government to discontinue use of Supreme's contract and commence performance under the new competitively awarded contract as expeditiously as possible." AR, Tab 9 at 718. The D&F further explains that "[t]he pricing model used" for the new contract "was developed, in part, to address the concerns with POT." *Id*. The agency describes the advantages to using a fixed distribution price regardless of the transportation mode used, and states that the longer the bridge contract is employed "the more likely it is that the Government is subjecting itself not only to potential overpayment, but also potential liability for future claims against the Agency as well as protracted litigation." *Id*. at 718-19.

The next numbered section concerns a second, related ground for the best interests determination --- the "improvements needed" in the SPV Afghanistan contract previously awarded to Supreme, as identified in the March 11, 2011 DoDIG report. AR, Tab 9 at 719. The head of contracting activity notes:

> DoDIG indicated that there were internal control weaknesses associated with the contract such as approving payments for minimum shipping weights per order when actual weights were less, the inability to determine whether the quantity of triwal[l]s billed [was] accurate or chargeable to the contract, having no assurance that performance based distribution fees were warranted, not knowing whether Government Furnished Material was adequately safeguarded, and other vulnerabilities with transportation invoices.

*Id*. Because DLA Troop Support's "lack of resources in theater hindered its ability to properly verify transportation methods (e.g. truck, rotary wing, or fixed wing), triwall usage, and shipment weights," the new contract includes "additional methods of reporting by the contractor" and uses a "fixed distribution price per category" which eliminates the need to track those particular aspects of performance. *Id*.

The head of contracting activity thus concluded that performance of the new contract was in the government's best interests, because of the monitoring difficulties associated with the previous contract. AR, Tab 9 at 719. Continued use of the bridge contract would result in "more time, resources, and capital" being "diverted away from essential mission support functions to focus on the burdensome verification issues." *Id*. The agency contends that use of the bridge contract "exposes" it to the identified "weaknesses and potential fraud," and "increases" its "likelihood of overpayment." *Id.*

In the third numbered section addressing the best interests determination, the head of contracting activity explains that the pricing model used in the previous versions of the SPV contracts was vulnerable to "fraud schemes," due to the payment of delivered fees in addition to distribution fees. AR, Tab 9 at 719-20. A fraud investigation concerning another contractor revealed five ways in which payments could be increased "irrespective of the work performed."

*Id.*[16]  In response, the new contract uses "new pricing definitions which provide greater protection against potential fraud," and allows the agency to negotiate prices directly with manufacturers, precluding certain fraud schemes.  *Id.*  Thus, the agency believes that "[f]ailure to commence performance of the new contract continues to expose the Government to potential fraud schemes," and adds that the new contract will "allow[] for a more meaningful price comparison amongst contracts," helping to identify fraudulent behavior.  *Id.*

Supreme maintains that the reasons given by the agency either amount to no more than the belief that the new contract is better than the old one, or are otherwise irrelevant to an override decision.  *See* Pl.'s Br. at 14-22; Pl.'s Opp'n at 9-17.  After careful consideration, the Court agrees with the plaintiff.  Taking the third ground first, the fact that another contractor may have defrauded the government under a similar contract is hardly a reason to conclude that plaintiff's bridge contract must be shortened by a few months.  The government concedes that Supreme is not suspected of any fraudulent behavior, *see* Def.'s Br. at 29; Def.'s Opp'n at 9-10, and in any event it is presumed that government contractors perform in good faith.  *See Alaska Airlines v. Johnson*, 8 F.3d 791, 795-96 (Fed. Cir. 1993).  While the vulnerability of the government to fraudulent practices is certainly a serious concern, the evidence in the record does not support any concerns over Supreme's continued performance of the bridge contract.  Supreme has been performing under SPV Afghanistan contracts for more than seven and one-half years.  AR, Tab 9 at 717.  After the other contractor was indicted for fraud relating to a different contract, the agency entered into three bridge contracts with Supreme, and exercised two options.  *See* AR, Tab 1 at 1; AR, Tab 9 at 717.  And in its evaluation of Supreme's offer for the new contract, the agency found the plaintiff's past performance "Acceptable" and its experience "Outstanding"; assigned an overall technical rating of "Outstanding"; and determined Supreme's overall risk level was "Very Low."  AR, Tab 14 at 733.  Thus, this particular concern "'runs counter to the evidence before the agency,'" *Ala. Aircraft*, 586 F.3d at 1375 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43), and is thus arbitrary.

The first ground given in support of the best interests determination is essentially that after the services required under the SPV Afghanistan contract were greatly increased by the agency, it could not reach agreement with Supreme concerning reasonable rates of compensation for the added work --- resulting in litigation.  *See* AR, Tab 9 at 717-19; AR, Tab 2 at 72-75.  Neither the government nor the intervenor have identified any precedents for the proposition that the government may prematurely shorten a contract in response to a contractor's exercise of its First Amendment right to petition the government to redress grievances, *see* U.S. CONST. amend. I; *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) (explaining "the right to petition extends to all departments of the Government"), much less one that finds such petitioning to represent "significant adverse consequences" justifying an override of the CICA stay.  In any event, there is no evidence in the record to support the agency's conclusion that a lengthier performance of the bridge contract subjects it to "protracted litigation."  AR, Tab 9 at 719.  If Supreme claims it is entitled to higher payments under its contracts (including the current bridge contract) than it received, nothing indicates that an extra few months of performance will

---

[16]  *See also* AR, Tab 1 (first superseding criminal indictment, *United States v. Public Warehousing Co. K.S.C.*, No. 1:09-CR-0490-AJB-TWT, N.D. Ga.).

"protract" such litigation in any way.  It might lead to higher amounts claimed, but would not appear to otherwise complicate or extend litigation over the composition of the rates of payment.

To be sure, the agency also explains that the pricing dispute creates "considerable risk and uncertainty concerning POT rates," and that under a longer performance of the bridge contract it "is subjecting itself not only to potential overpayment, but also potential liability for future claims."  *Id.* at 718-19.  The government argues that the agency's "reason for the override was that the pricing dispute results in considerable uncertainty as to whether DLA is overpaying or underpaying for Supreme's deliveries" and notes the "large pricing disparity" between what Supreme believes is appropriate and what the agency is paying.  Def.'s Opp'n at 5.  Anham stresses this pricing disparity, estimated to average $18 million per month, as a reasonable basis for an override.  *See* Intervenor's Br. at 16-17; Intervenor's Reply at 3-4.  But the Court cannot see how this ground for the override differs from the claim that the new contract is better than the old, which is frequently rejected by our court.  *See, e.g.*, *Nortel Gov't Solutions*, 84 Fed. Cl. at 251-52; *Reilly's Wholesale*, 73 Fed. Cl. at 711.

The payment of significantly higher costs under an incumbent or bridge contract could be the sort of significant adverse consequence to justify an override when these are shown to be prohibitive.  *See Advanced Sys. Dev., Inc. v. United States*, 72 Fed. Cl. 25, 31(2006) (citing *Sierra Military Health Servs., Inc. v. United States*, 58 Fed. Cl. 573, 581 (2003)); *Automation Techs., Inc. v. United States*, 72 Fed. Cl. 723, 729 (2006).  The record, however, does not contain any such showing.  The worst case scenario for the agency would appear to be that the bridge contract's POT rates could cost it about $30 million per month --- which is some $17 million more per month than it would like to pay Supreme.  *See* AR, Tab 9 at 718.  No comparison is made, however, of these amounts to the corresponding monthly payments under the contract with Anham.  *See* Tr. at 89.  The D&F states that the Anham contract has an estimated value of $8,065,696,363.40 over a sixty-six month period.  *Id.* at 716.  This roughly translates to payments of $122.2 million per month.  The administrative record provides no basis for determining whether the portion of these monthly payments that corresponds to deliveries that are the subject of the POT rates dispute is lower than $13 million or higher than $30 million, or somewhere in-between.  The Court notes that even if the bridge contract were to cost $17 million more per month than the new contract for these deliveries, as a percentage of the new contract's value this is not much different from the cost savings that have found insufficient to support an override in other contexts.  *See Automation Techs.*, 72 Fed. Cl. at 729.  But in any event, it is not even cost savings but rather the *uncertainty* concerning cost savings that is proffered as a justification, which is far from "significant adverse consequences [which] will necessarily occur if the stay is not overridden."  *Reilly's Wholesale*, 73 Fed. Cl. at 711.

The pricing dispute ground also includes the "potential" that the agency is overpaying under the bridge contract.  AR, Tab 9 at 719.  But considering that the alleged overpayments identified in the December 9, 2011 decision of the contracting officer have been addressed by the (unilateral) definitizing of rates, the determination of the distribution fee offset, and the elimination of POT rates for deliveries to certain facilities, *see* AR, Tab 4 at 429-32, it is hard to see how those same types of overpayments could continue under the bridge contract.[17]

---

[17] The bridge contract POT rates were based on the definitized rates, adjusted upwards by

Moreover, if the bridge contract payments are indeed to be litigated before the ASBCA or another tribunal, that proceeding should alleviate any fears of overpayment.  The overpayment rationale, however, is also discussed under the remaining best interests ground, to which the Court now turns.

The head of contracting activity maintains that the March 11, 2011 DoDIG report "determined that there were improvements needed in the current Subsistence Prime Vendor contract for Afghanistan," and that the new contract "address[es] the[se] concerns."  AR, Tab 9 at 719.  But other than the failure to timely definitize POT rates, which has since been addressed, *see* AR, Tab 4 at 429; Def.'s Ex. 1 at 3, the report does not concern problems with the contract, but rather problems *with contract administration*.  AR, Tab 2 at 68, 76.[18]  The agency failed to properly monitor and verify costs, in part because regulations concerning the use of quality assurance surveillance plans and of written monitoring procedures were not followed.  *Id.* at 76, 102.  At the time of the report, the agency represented that it would develop the necessary plans and procedures to provide for the "validation," "verification," and "monitor[ing]" identified in the report, "no later than December 31, 2011."  *Id.* at 92, 114, 116-17.  In the override decision, however, the agency states that it "determined that its lack of resources in theater hindered its ability to properly verify" billing matters.  AR, Tab 9 at 719.  This finding has no support in the administrative record.  The agency explains that new features in the contract awarded to Anham --- changing the method of contractor reporting and of pricing --- eliminate the verification burdens that the agency lacks resources to shoulder, freeing up resources and reducing the risks of fraud and overpayment.  *Id.*

Even if the resource constraint claim were supported, the problem with the agency's finding in this area is that the record shows that the current bridge contract was issued in June 2012, *see* Def.'s Ex. 1 at 1 --- more than fifteen months after the DoDIG report, and more than three months after the date the validation and verification issues were to be addressed by the required plans and procedures.  This fact undermines any purported concern about the risks of fraud and overpayments, or of resource diversion, under former approaches to pricing and reporting.  No reason is given why the new reporting approach was not added to the bridge contract, or why some variation of the new pricing method was not employed.  Instead, in the justification for the sole-source award of the bridge contract, the contracting officer "determine[d] that the anticipated cost to the Government will be fair and reasonable."  Pl.'s Ex. 2 at 5.[19]  If these costs prove higher than anticipated as a result of the litigation the government expects Supreme to initiate, then this will be because the tentative rates have been found unreasonably low by an independent tribunal.  And any such litigation should provide the government with a forum to recoup any overpayments due to verification weaknesses.  In any

_____

[XX]%.  Def.'s Ex. 1 at 3.

[18]  Indeed, the summary of the report states:  "The subsistence prime vendor for Afghanistan provided the food products required by the contract.  However, subsistence contracting officials at the [DLA] Troop Support did not provide sufficient oversight of contract costs and performance."  AR, Tab 2 at 68.

[19]  The Court notes that the head of contracting activity recommended the justification's approval.  *See* Pl.'s Ex. 2 at 7.

event, a weakness addressed by the terms of a new contract is not a "rationale asserted by the agency that is above and beyond its original purpose when it solicited bidders," *Nortel Gov't Solutions*, 84 Fed. Cl. at 247-48; *see also Advanced Sys. Dev't*, 72 Fed. Cl. at 31; and efficiencies associated with a new contract are not enough to justify overriding the CICA automatic stay. *See CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100, 113 (2006); *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 662-63 (2003).

The Court finds that this monitoring weakness rationale does not demonstrate "significant adverse consequences will necessarily occur if the stay is not overridden," but rather means that "the new contract would be better than the old one." *Reilly's Wholesale*, 73 Fed. Cl. at 711. It "'runs counter'" to the representations in the DoDIG report, and in light of the subsequently issued bridge contract "'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft*, 586 F.3d at 1375 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). In sum, the Court finds all the grounds asserted in support of the best interests determination to be arbitrary. Coupled with the similar finding concerning the urgent and compelling circumstances justification, explained above, this is enough to find that the override decision was arbitrary and cannot stand. But the Court will briefly consider the other *Reilly's Wholesale* factors, which were addressed in the override decision.

### 3. The Availability of a Reasonable Alternative

The head of contracting activity acknowledges that performance of Supreme's bridge contract is a "reasonable alternative" to the override. AR, Tab 9 at 722. This alternative was nevertheless found "not acceptable for two reasons." *Id*. First, the bridge contract was characterized as "a sole-source solution under which unresolved pricing issues and continued potential for fraud . . . are not remedied." *Id*. The second reason was that "failure to begin implementation of the follow-on contract prevents the Government from being able to adequately plan for and develop new logistical and operational tactics in the region." *Id*. The head of contracting activity also mentions, with no elaboration or support, that "many additional performance issues, including tax issues with the Government of Afghanistan that have threatened to restrict movement in-country, remain unresolved." *Id*. The defendant does not rely on this last point, as Anham might be subject to the same tax issues, *see* Tr. at 87-88, and the bridge contract specifically states that it is exempt from Afghan taxes. Def.'s Ex. 1 at 3.[20]

As was addressed above, the fraud concern was contradicted by the evidence in the record showing more than seven and one-half year's performance by Supreme, AR, Tab 9 at 717, including under three bridge contracts issued (and two options exercised) after the indictment of another contractor, *id*.; AR, Tab 1 at 1, and resulting in ratings of "Outstanding" and "Very Low" risk. AR, Tab 14 at 733. And if the specter of litigation to be brought by Supreme means that the pricing issues are considered unresolved, a shortening of the bridge contract by a few months does nothing to change this. A bridge contract with a capable contractor, issued after the agency

---

[20] Anham contends that this claim of restricted movement represents a threat to health and safety. *See* Intervenor's Br. at 22. But since it is not supported in the administrative record, and contradicted by the terms of the bridge contract, this claim cannot be a rational basis for an override of the stay.

was well aware of the pricing issues and fraud vulnerabilities, which can cover any period of delay in implementing Anham's contract (if implementation is even necessary), is certainly a reasonable alternative to intervenor's performance.  The claim that planning and development of "new logistical and operational tactics . . . has already proved problematic with" Supreme, AR, Tab 9 at 722, is not supported in the record and, moreover, concerns matters which would seem to be irrelevant were Supreme to win the new contract.  The determination that the bridge contract is not an acceptable alternative lacks a rational basis.

### 4. The Cost-Benefit Analysis

In considering "the potential cost of proceeding with performance," the head of contracting activity purported "to consider the consequences in the event that GAO would sustain Supreme's current protest," in comparison with "the benefits of continued performance." AR, Tab 9 at 723.  But neither the costs nor the benefits are rationally considered.  After a generic reference to "various implementation milestones which Anham must meet," the agency notes that while the GAO protest is pending, "Anham would only be preparing to begin receiving and delivering orders as opposed to actually receiving orders and delivering supplies to the end customer."  *Id.*  This supposedly limits costs to such items as "labor and materials."  *Id.*  Since "under Anham's contract, the Government does not pay for the contractor's implementation, per se, but rather, Anham recoups those costs through the price it charges on completed delivery orders," the head of contracting activity concludes that "the Government will not generally be subjected to duplicative costs associated with having Anham continue performance while Supreme's bridge contract is in place."  *Id.*

The problem with this half of the cost-benefit equation is that the agency entirely ignored its potential liability for the implementation costs if Supreme's protest were successful and the plaintiff were ultimately awarded the new contract.  Under the termination for convenience clause of the solicitation, Anham would be "paid a percentage of the contract price reflecting the percentage of the work performed prior to the notice of termination, plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system, have resulted from the termination."  AR, Tab 3 at 133 (48 C.F.R. § 52.212-4(l)).  Costs of performance, including expenditures made in reliance on a contract, are ordinarily recovered when the government terminates a contract for convenience.  *See*, *e.g.*, *General Dynamics Corp. v. United States*, 131 S. Ct. 1900, 1908 (2011) (citing 48 C.F.R. § 52.249-2(g)); *Hi-Shear Technology Corp. v. United States*, 356 F.3d 1372, 1383 (Fed. Cir. 2004); *United States v. Amdahl Corp*, 786 F.2d 387, 395 (Fed. Cir. 1986).  Given that the "various implementation milestones," AR, Tab 9 at 723, include the approval of one distribution facility and the construction and approval of two others, *see* AR, Tab 6 at 615-16, such costs could easily be of significance --- but the record does not even indicate an attempt to determine them.  *See also* Tr. 67.

The other half of the equation is no more satisfactory.  As was discussed above, the primary financial benefit from Anham's performance --- any net savings due to the intervenor rather than the plaintiff performing the contract a few months earlier --- was also not estimated by the agency.  With neither a rational reckoning of costs nor benefits, the determination that "the benefits of continuing performance under the contract . . . outweigh the potential cost risk," AR, Tab 9 at 723, lacks a rational basis.

*5.  The Impact on Competition and the Integrity of the Procurement System*

The head of contracting activity was of the belief that "[a]ny negative effect on the procurement system as a result of Anham's performance" was "mitigated and justified."  AR, Tab 9 at 724.  This was based on the fact that Supreme has been performing non-competitively awarded bridge contracts for more than two years, and the agency's representation that it "would be prepared to take any corrective action GAO deems necessary to ensure compliance with the principles of CICA."  *Id.*[21]  Recognizing that Anham "will be operating primarily in an implementation phase during the pendency" of the GAO proceedings, *id.*, the agency seemed to be of the opinion that the intervenor's progress under the contract would pose no obstacle to following a GAO recommendation in Supreme's favor (although the agency felt such a decision "unlikely," *id.*).[22]  The Court doubts that a sole-source bridge contract, awarded to an incumbent who had previously won a procurement, must necessarily be viewed as having less competitive dignity than an award under challenge in a GAO protest.  But in any event, it appears that the agency has considered all of the relevant information in reaching its conclusion on this point, which is a question of judgment the Court may not second-guess.

**C.  Is Injunctive Relief Necessary, or is a Declaratory Judgment Enough?**

For the foregoing reasons, the Court has found that the agency arbitrarily overrode the CICA automatic stay.  This satisfies the first factor for injunctive relief --- success on the merits.  *See Centech Grp.*, 554 F.3d at 1037.  But must the Court consider the other three factors --- irreparable harm, the balance of harms, and the public interest, *see id.* --- in order to restore the CICA stay of performance?  Although plaintiff's complaint requested a temporary restraining order and preliminary and permanent injunctive relief, it also seeks a declaratory judgment that the override decision is invalid.  *See* Compl. at 13 (Requests for Relief ¶¶ 1-2, 4).  In its motion for judgment, plaintiff's primary request appears to be for declaratory relief, relying upon many decisions in which judges of our court have held that the declaration that an override was invalid suffices to restore the stay of contract performance, without the need to consider the injunctive relief factors.  *See* Pl.'s Br. at 8, 33 (citing *Chapman Law Firm Co. v. United States*, 65 Fed. Cl. 422, 424 (2005); *URS Fed. Servs., Inc. v. United States*, 102 Fed. Cl. 674, 676 (2012); *Advanced Sys. Dev.*, 72 Fed. Cl. at 36; *CIGNA Gov't Servs., LLC v. United States*, 70 Fed. Cl. 100, 114 (2006)); Pl's Opp'n at 24-26.  The government notes this line of cases,[23] but argues that when a

---

[21]  As the plaintiff notes, such an intention to voluntarily comply with a future GAO recommendation cannot make the CICA stay moot, *see* Pl.'s Opp'n at 23 (citing *Unisys Corp. v. United States*, 90 Fed. Cl. 510, 517 (2009)), as the agency may always change its mind.

[22]  Another ground given by the agency for the best interests determination was the head of contracting activity's view that "the likelihood of Supreme's success at GAO is low."  AR, Tab 9 at 723-24.  But the defendant takes the litigation position that "[t]he merits of Supreme's protest are irrelevant to whether the agency properly implemented the override," Def.'s Opp'n at 13, and this ground was accordingly not considered by the Court.

[23]  *See* Def.'s Br. at 21 (citing, *inter alia*, *PMTech, Inc. v. United States*, 95 Fed. Cl. 330, 347-48 (2010); *Automation Techs., Inc. v. United States*, 72 Fed. Cl. 723 (2006); and *E-Management Consultants, Inc. v. United States*, 84 Fed. Cl. 1 (2008)).

declaratory judgment would have the same effect as an injunction, a court must utilize the injunctive relief factors.  Def.'s Br. at 21-23 (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed. Cir. 2004) and *Superior Helicopter LLC v. United States*, 78 Fed. Cl. 181, 194 (2007)); Def.'s Opp'n at 14-15.  Anham agrees with the government, arguing that the injunctive relief standard must be satisfied if declaratory relief is to stay contract performance.  *See* Anham's Reply at 13-15 (citing *Samuels v. Mackell*, 401 U.S. 66, 71-73 (1971); *PGBA*, 389 F.3d at 1227-28; *Superior Helicopter*, 78 Fed. Cl. at 194)).[24]

After carefully reviewing the relevant precedents, the Court agrees with the reasoning of *Chapman Law Firm Co. v. United States*, 65 Fed. Cl. 422, 424 (2005), and the line of cases following that opinion.  In creating the CICA stay of performance, Congress decided that the injunctive relief factors need not be invoked when a bid protest is timely filed with the GAO, instead requiring that contract performance be stayed automatically.  *See* 31 U.S.C. § 3553(d)(3)(A)-(B).  The only exceptions allowed by Congress are lawful overrides on "best interests" or "urgent and compelling circumstances" grounds.  *See* 31 U.S.C. § 3553(d)(3)(C).  To allow an arbitrary override to insert the injunctive relief requirements into the process would convert the CICA stay to something other than what Congress created.

The Federal Circuit's decision in *PGBA, LLC v. United States*, 389 F.3d 1219 (Fed. Cir. 2004), does not dictate a contrary result.  It relied upon a Supreme Court case which held that when tradition or statute requires *more* than the typical injunctive relief factors --- there, because of a "longstanding policy limiting injunctions" of state criminal prosecutions, *Samuels v. Mackell*, 401 U.S. 66, 72 (1971) --- declaratory relief that would accomplish the same result as an injunction must meet that higher standard.  *See id.* at 69-72 (deciding only "the limited question whether, in cases where the criminal proceeding was begun prior to the federal civil suit," the rule should apply, and employing it because "deeply rooted and long-settled principles of equity have narrowly restricted the scope for federal intervention"); *PGBA*, 389 F.3d at 1228 (citing *Samuels*¸401 U.S. at 71-73).  It was only because of this higher, "immediate irreparable injury" standard, that the Supreme Court required declaratory relief to meet the injunctive relief standard.  *Samuels*, 401 U.S. at 68-69; *see also Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 297-99 (1943) (limits on federal court injunctions of state tax collections extended to declaratory relief actions).  Our case presents the opposite situation, as Congress has enacted a statute requiring *less* than the typical injunctive relief factors.  The Federal Circuit, in *PGBA*, extended the *Samuels* rule to cases in which declaratory relief was sought to accomplish what would ordinarily require application of the ordinary injunctive relief factors --- the setting aside of an improperly-awarded contract.  *PGBA*, 389 F.3d at 1228.  But since Congress does not require the application of those factors to accomplish a stay of contract performance during the pendency of a timely-filed GAO protest, they need not be applied when the same result is accomplished through declaratory relief.

---

[24] The intervenor also noted that "numerous cases have decided override challenges based on analysis of the injunctive factors."  Anham's Reply at 14 n.8 (citing *Reilly's Wholesale Produce v. United States*, 73 Fed. Cl. 705 (2006) and *Spherix, Inc. v. United States*, 62 Fed. Cl. 497 (2004)).

Accordingly, the Court concludes that its declaration that the override decision dated December 21, 2012, was issued arbitrarily and in violation of 31 U.S.C. § 3553(d)(3)(C)(i), is sufficient to reimpose the stay of contract performance mandated by 31 U.S.C. § 3553(d)(3)(A)-(B).  Although, as the government points out, without an injunction the agency is free to initiate another override of the automatic stay, Def.'s Opp'n at 15, the Court is of the opinion that the preservation of this option is particularly appropriate in a case concerning services provided to troops in a war zone --- as the Court must "give due regard to the interests of national defense." 28 U.S.C. § 1491(b)(3).  Plaintiff's motions for injunctive relief are therefore DENIED as MOOT.

## III.  CONCLUSION

For the foregoing reasons, the Court concludes that the decision to override the CICA stay of performance issued by DLA Troop Support on December 21, 2012, was arbitrary, capricious and contrary to 31 U.S.C. § 3553(d)(3)(C)(i), and is thus invalid and of no effect.  The plaintiff's motion for declaratory judgment on the administrative record is **GRANTED**, and the motions for judgment on the administrative record by defendant and defendant-intervenor are **DENIED**.  The Clerk of Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Victor J. Wolski             

**VICTOR J. WOLSKI**
Judge